Good morning. Council, if you are reserving time for rebuttal, please let us know at the beginning. And by agreement, each side has ten minutes in this case, and AES, you may begin. For the record, Scott McDonald, appearing on behalf of the AES entities, which I may occasionally refer to as AES in a singular, but should be deemed to include both, same with respect to references to the purchase agreements and the subject consulting agreements. And unless the court has a different preference, I was going to... Could you keep your voice up just a little bit? Sure, Your Honor. Absolutely. Thank you. Unless the court has a different preference, I was going to proceed with my client's appeal and then address the ACURI appeal second. That's fine. Okay, thank you. With regard to AES's appeal, the district court ruled that AES is entitled to collect its attorney's fees, but first must make a demand and that that demand cannot be made until the conclusion of this case. So the district court started off down the right path, recognizing, as required by case law, that the first consideration is whether or not the taxpayer, in this case Mr. Rotondo, has a property interest, which is decided with reference to state law. And in this case, AES submits that there is no case law that is... This case is distinct from the case law cited by the other parties, and I'll get into that. But what the court did is it limited its analysis only to the indemnification provisions set forth in the asset purchase agreements. And other than a fleeting reference to the consulting agreements, failed to consider some paramount language contained within those consulting agreements, which I'll also, of course, address. So in that respect, AES's position is that the district court's analysis under state law, governing the interpretation of contracts, was incomplete before it gets to the tax lien issue, which is the second step. Incomplete because it didn't properly address the consulting agreements. But before I discuss the consulting agreements, the district court also misinterpreted the asset purchase agreements themselves in the following ways. Oh, go ahead. Thank you. I'm waiting to hear. Sure. Primarily, the district court ruled that AES is required to make a demand under the indemnification provisions set forth in the asset purchase agreements before it can offset its attorney's fees against any sums owed to the taxpayer, Mr. Rotundo. Well, I'm not sure why that's wrong. And I guess I have two questions. Why is that wrong, and why didn't you make a demand? Excellent question. And a demand may have been made, but it's not a matter of record. All right. Well, that's your responsibility. Thank you. Yes. So it says, will pay purchaser on demand the full amount of any sum which purchaser may pay or become obligated to pay. That's how I read the indemnification provision, right? Yes. That is a correct interpretation and a correct reading of sentence one. But if we dissect that entire paragraph, there's really three operative provisions. Sentence one does contain the demand language, and it covers any litigation claims, proceedings, expenses, and losses. And we all agree, as you pointed out, there's not a demand in the record. There's not a demand in the record. Okay. So what is this next? What are you saying is sentence two or? Problem two or misinterpretation number two? Sure. Well, I don't see that as a misinterpretation. Am I missing something? Well, I would submit to the court that it is a misinterpretation, given the fact that the third sentence, which is the offset language, does not contain any demand language, number one. And number two, that this completely fails to address in the consulting agreement. So you're saying we don't read it in context. So explain to me how this would operate in practice, because I'm not sure I follow you. So you don't have to make a demand if you want to offset it. You only have to make a demand otherwise? Yes, Your Honor. In fact, the demand language is subject to varying interpretations clearly. The district court interpreted the demand language, and the IRS has taken the position, that that word demand imposes a condition upon AES. AES submits a slightly different, well, completely different interpretation, that that demand language actually imposes a condition upon rotundo. It means when we ask for the money, you pay on demand, but pay not. The demand language in contracts is usually, it says, will pay purchaser on demand. So that, to me, implies he doesn't have to pay unless you make a demand. But the offset language does not contain the demand language. Okay. So go ahead and explain. So what you're saying is the demand provision is completely irrelevant then. You're reading it out of the contract. Not quite. So what I'm going to get into momentarily is the consulting agreement itself, which really primes this language. So the courts, I certainly. You're saying I have to read an additional agreement to understand the language in this agreement? Yes, Your Honor. And I would be happy to explain that and why that's the case. The consulting agreement does incorporate, by reference, the asset purchase agreement. But the key, let me, if the court will allow, I will continue with the district court's misinterpretations of the asset purchase agreement. And we'll come back to number one when I address the consulting agreements, if that's fair. Okay. Issue number two is that AES, the district court ruled that AES must wait to make that demand. Now, that's a real problem, wait until the end of the case, because the district court cites no law in support of that proposition and also cites no contractual provisions. Literally, the district court. Irrespective of that, there's no evidence in the record of a demand. So you don't have to wait to do it externally? If the district court is correct, the district court ruled that we cannot make, that AES cannot make a demand for indemnification until the conclusion of this case. If the district court is correct, then the ship will have sailed. The $260-some-thousand that's already impounded with the district court in Michigan will have been released to the IRS, and we will never have a chance to get that money back. So there really is no reason that my client can't make the demand now. There's no reason that it needs to make the demand after the conclusion of the case, as the district court ruled. Again, no law cited in support of that proposition and no interpretation. Literally, the district court is reading a new provision into the contract. Thirdly, if I may, because this is important, the district court also ruled that AES may only collect future legal fees upon making a demand. Once again, the district court cites no law in support of that proposition and cites no facts in support of that proposition and is reading a new provision into the contract itself. If the only condition is that AES makes a demand, why can't it demand attorneys' fees that have accrued in the past, including both the state court litigation brought by Curry, which was resolved on summary disposition, and this case, of course. Now, I've got 20 seconds left. So the consulting agreements, of paramount importance... You never addressed the offset provision, right? The consulting agreement does not require any demand whatsoever. The consulting agreement provides a formula by which Mr. Rotundo's consulting fee is calculated. And that formula allows AES to deduct its expenses from the first instance. But the consulting agreement defines expenses, right? And it includes, I'm trying to find the specific language, but it says direct expenses, and then it includes this language about leased employees. Which are the customer accounts. That's right, because AES is a PEO, which is a professional employment organization. These customer accounts are really employers. But is Rotundo a customer? No, he's the former owner of... Right. So how do you get to deduct his expenses? The expenses, the legal expenses, were incurred in defending my client's very ownership of the customer accounts and employees that were purchased. But those aren't attributable to any individual leased employee. And isn't that the way the language reads? I mean, it has to be attributable to, right? Agreed. However, it's attributable actually to all the employees collectively, not any individual employees. No, no. Attributable to leased employees is the way the language reads. And you just explained that leased employees were your customer employees, and Rotundo's not a customer. Correct, but Rotundo and the sellers incurred the tax liability, the payroll tax liability, that led to these cases in the first instance. And Rotundo's ownership, in the asset purchase agreements, Rotundo represented that he had clear title to these customer accounts, which consist of the employees that AES would then take over and lease back to the employers. So the litigation, the state court case, and in fact this case, after a query intervened to make many of the same claims, challenges my client's very ownership and right, contractual rights, with respect to those employees. And I can't imagine anything that's more direct that would be incurred with respect to them. Okay. Your time is up. Any further questions? Judge, any further questions? Thank you, counsel. Thank you. Good morning. Good morning. My name is Nathan Resnick, and I'm appearing today on behalf of both the appellant and the appellee in the two different cases, a Curry Investments LLC, appearing as an appellant with regard to the district court's grant of summary judgment in favor of the appellees and as the appellee in favor of the IRS's grant of summary judgment against the AES plaintiffs. With regard to the critical issues that I think this court needs to consider, the district court was asked to look at who owned the assets associated with the security interests that my client had. The magistrate judge in this case was very succinct and clear that that was an open issue. Therefore, there was a genuine issue of material fact as to who owned these customer accounts. Where I think the confusion came in with regard to the district court is the district court was looking at ultimately the end result of the consulting fees that are now being held by the court. Our position all along is my client had a first senior security interest in the assets of what is called PPMSG, also known as People Plus, and Apex Admin. The state court below didn't make a ruling on that issue. The parties here have talked much about that with regard to Raise Judicata and collateral estoppel. However, the state court never made a ruling on that. What evidence was presented that the directional entities owned them? The opposing party provided four different pieces of evidence. No, I understand what they provided. So they provide four pieces of evidence? Yes. What evidence was presented against that? The evidence that was presented against that was the following. Number one, that the directional entities all filed assumed name certificates with the state of Michigan doing business as People Plus. People Plus is the management company affiliated with Apex Admin. My client had a first lien position on People Plus and Apex Admin. None of the directional entities filed any annual report  The last filing that they made was a resignation of their respective resident agents. One of the directional entities, AS South, was administratively dissolved by the Florida State Department of State on September 28, 2012. So I understand all of that to me seems to go, and I distinguish these arguments so you should tell me where I'm wrong. I understand you'd have two arguments you're raising, one being the directional entities did not own this. Correct. And the second being the directional entities are a sham. And all of what you've pointed to seems to go to the sham proposition and not who owned the customer list. So assume, for the sake of my hypothetical, that the directional entities are a legitimate company. Is there any evidence showing that if you have these two legitimate companies, evidence tying the customer list to AES Apex? I'm in an unfortunate position of having to prove a negative, Your Honor. Why? Did you submit any evidence showing that AES Apex owns them? That seems to be a positive, not a negative. I'm not saying show evidence directional entities didn't own them. Well, the best evidence that would have proved who owned the customers, so to speak, would have been the contracts themselves. If there was a contract that specifically said, this customer is doing business with Apex Admin or PPMSG versus this customer is doing business with one of the directional entities. But is there such a contract? No. But that's my point. Didn't you take depositions? We took depositions, Your Honor, and we tried to provide that deposition testimony in our supplemental brief, which is another part of our contract. We can get to that in a minute. But is there any evidence you presented in a timely fashion, that presupposes the last issue I recognize, to the court that AES Apex and not the directional entities own the customer list? Yes. I think the evidence that we presented is there was, number one, no contracts between the directional entities and these customers. That doesn't prove who owned it. In other words, you don't have to have a contract to buy something. If I go and buy something, I don't have to have a contract. A written contract. A written contract. Well, there's only two possibilities here, I guess. A written contract or an oral contract, and we won't get into the statute of frauds for a minute because we didn't make that argument. But nobody is suggesting, and it was never raised below, that there was some type of oral contract between any of these customers. But was there a contract between Apex and Rotundo regarding the customer list? There wouldn't be, just to clarify, there wouldn't be a contract between Apex and Rotundo. Apex is the operating entity. The evidence that we submitted, and I'll go on. People First or whatever you called it. PPMSG, which is People Plus. People Plus. Which is, again, you asked what evidence was given. The directional entities all filed assumed name certificates with the State of Michigan doing business as People Plus. And that was submitted timely. So if the directional entities are all doing business as People Plus, then People Plus is the one that's doing business with the customers. So that evidence was submitted timely, and that's who was doing business. When the People Plus or Apex admin held itself out as a PEO, it was holding itself out to these customers as People Plus or Apex admin. It was not holding itself out as one of these directional entities, which I've already gone into, were dissolved. I should also add that the Michigan directional entities were never licensed PEOs. So how can you do business with a directional entity that doesn't have a license to do work as a PEO? It just can't do business. Can I ask you a question? Who was the money paid to? That's exactly the next point I was going to make. The money was all paid to Apex admin. Was it or was it paid to Rotundo? It was paid to Apex admin. No, it all went through Apex admin. Rotundo, just so we're clear, is an individual, and he's the individual 100% owner. But he's the consultant, right? No, he's not the consultant, Your Honor. I think we're confusing two different transactions. Mr. McDonald was referring to after the sale to Mr. Otto, the AES plaintiffs, then he got some of the consulting fees back. I'm talking about the time frame before that when PPMSG and Apex admin are doing business with their customers and my client has a first lien position on all of the assets of PPMSG and Apex admin and the directional entities for that matter. You asked me about financial information. Where does the money flow to? Wait, you do have a lien against the directional entities? We have a lien against the directional entities. But it was later in time? No, that wasn't the issue, Your Honor. The issue with the directional entities, which gets us back to the assets, is my client had a first lien position on the directional entities but did not have a lien on the assets of the directional entities. So the state court ruled, yes, you're first in line, yes, you have a first position, but you don't have a lien on the assets. So here we are today talking about who owned the assets. And that was a central issue that the district court needed to make a ruling on. Evidence was in support. And the last thing I'd like to, I see my time is up, but you asked me a question about the financial records and the banking records. And we did submit timely that all banking was done through Apex admin's account at Citizens Bank. All the money went to Citizens Bank. In addition, Mr. Rotundo submitted an email where he Well, your time is up. So unless the judges have any other questions, I'll give you one sentence to conclude. Last sentence, Your Honor. Projected gross income generated by Apex admin was $2.86 million, which became the operating budget for PPMSG, derived from the projected $132 million in revenue that Apex admin generated through its customer accounts. That's a long sentence, counsel. Thank you. Thank you. But that's where the money flowed to Apex admin based on Mr. Rotundo's comment. Thank you. May it please the Court, Jeff Klimas to the United States. We submit that this appeal presents three main issues. First, how to calculate the consulting fees owed to Dino Rotundo under the consulting agreements. Second, the relative priority to those fees as between the government's tax liens and AES's contractual right of indemnification and set-off. And third, relative priority to those fees as between the government's tax liens and ACOURI's security interest against Apex admin. As to the first issue, under the consulting agreements, Rotundo's fees are calculated as a percentage of gross profits, specifically defined not in the generic sense of revenue minus expenses, but specifically to be revenue minus taxes and minus direct expenses attributable to the employees leased under the customer accounts. The most natural reading of this phrase, expenses attributable to the employees leased, is operational expenses linked to the employees. You know, wages paid to employees, supplies used by the employees. It cannot naturally be stretched, as AES would stretch it, to include legal fees associated with the customer accounts more broadly. And in fact, a narrow interpretation of this phrase, expenses attributable to the employees leased, is supported by the fact that the parties to this contract modified that with the limiting adjective direct. Not any expenses attributable to the employees leased, but direct such expenses. It is further reinforced by comparing this very carefully circumscribed language, direct expenses attributable to the employees leased, with the much broader language that the parties to these contracts used in the purchase agreements and the indemnification clauses. There they didn't say direct expenses attributable to the employees leased. Rather, they talked about any loss, damage, liability, or deficiency. So can I ask you about, I'm not sure if you're moving on to the second issue, but can I ask you about that? Yes. As you started to indicate. So why do they have to wait until the end of the case to make a demand? Yes, Your Honor. I'm not sure if that's dicta by the district court. You agree it's wrong. It's not necessarily wrong in light of what the Supreme Court has said in a line of cases dealing with entitlement to attorney's fees in an interpleader case. The Supreme Court in RF Ball Construction, the Supreme Court in Liverpool and London Globe, and Pioneer American Insurance Company has said that in an interpleader case, a litigant's inquit claim for attorney's fees cannot be paid from funds that are impressed with a federal tax lien. And we think probably the best synthesis of this line of Supreme Court cases is contained in the Seventh Circuit's decision in Campagno-Toronto Bakery, which also, like this case, deals with the contractual right of indemnification and set-off. And what the Seventh Circuit said in following this line of Supreme Court cases is that until a court makes an award of attorney's fees, the interpleading plaintiff's claim for such attorney's fees remains inchoate and therefore cannot take priority over a duly recorded federal tax lien. That makes sense, but then I'm not sure I follow why they have to wait until the end of the case to make a claim. In other words, why wouldn't we just interpret the contract, and the contract says on demand, and so they can make a claim. It doesn't say at the end of the case you have to make a demand. It seems to me they can make a demand at any point for any costs incurred. That's correct. The AES could make a demand at any point, and we don't dispute that. There's a question as to whether they would have a co-it claim for their attorney's fees before the court actually awarded such fees, but you're correct that at any point prior to litigation, during litigation, today, yesterday, tomorrow, AES could make a demand for indemnification. And what you're saying is it doesn't become co-it until the court awards? But why is that? What if I, let's take this out of the context of litigation. If I make a demand and the litigation is ongoing, but we know the cost and the other side doesn't dispute the cost, why aren't those due at that point? Go ahead. It's possible that the district court could disagree. They say that these attorney's fees were not reasonably incurred in connection with the case, were excessive, shouldn't all be allowed, and so there is some Supreme Court address that in these cases you're referencing, or the Second Circuit? The Seventh Circuit, Your Honor. The Seventh, I'm sorry. Yes, that is the reasoning, is that until the court actually awards the fees, the interplea and plaintiff may have a claim to such fees, but does not have an established right to those fees, that there has to be a judicial determination. And I think AES has said that it's entitled to its attorney's fees, has told the district court that, but has never specified the amount, and so the district court, even if it wanted to, could not yet make a determination as to the reasonableness of those fees and what fees AES is in fact entitled to. As to priority between the government's tax lien and AES's contractual right of indemnification and setoff, we think that the district court correctly focused in on the language of the purchase agreements, which condition the right of indemnification and setoff on AES first making a demand for payment, which AES did not introduce any evidence that it had done prior to the court granting summary judgment. Now, on page 10 of its reply brief in this case, AES has actually conceded that demand has conditioned precedent to its right of indemnification. It said that the purchase agreements requires AES to make a demand before it can be indemnified by Rotundo for its losses, including attorney's fees. What it then tried to argue in its reply brief, and then here today, is that its right of setoff is completely separate and independent from its right of indemnification. We think that this argument fails both as a matter of logic and as a matter of contract interpretation. Logically, AES has no right to no legal basis to make Dino Rotundo pay a single dollar of its attorney's fees, connected to this litigation or any other litigation. Now, Senator Eiffel, it seems to me the offset provision at least contemplates that they would be able to deduct litigation expenses. After a demand has been made and gone unsatisfied. Why? I mean, AES obviously reads these provisions separate, the offset. I recognize they're all in the indemnification, but why is that so? Where does the language indicate that it has to be after a demand? So I think that AES concedes that indemnification is only triggered by a demand for payment. Right, but the offset says, In addition, all sellers in guarantee will jointly and severally indemnify and hold harmless purchaser for and against any costs and expenses, including attorney's fees, which the purchaser incurs to enforce the indemnification obligations. Purchaser shall have a right to offset such lessee's damages, liabilities, and attorney's fees. Right, and that last sentence, the set-off clause, speaks to such losses, damages, liabilities, or deficiencies. Referencing back the losses, damages, liabilities, or deficiencies in the first sentence of the indemnification provision. Why? Why doesn't it reference the broader provision? Because those costs are only costs incurred in enforcing the indemnification provision by litigation. There's no litigation to enforce the indemnification provision. That's if you read it as the antecedent clauses being that, but what if you read the broader clause? I'm sorry, the broader clause of the three sentences, the first sentence? Yes, why not? Go ahead. When a set-off clause speaks to such losses, damages, liabilities, or deficiencies, that's referencing back to those words used in the first sentence, the indemnification clause. The losses, damages, liabilities, or deficiencies for which Rotundo is required to provide indemnification on demand. That that's the way that it has to be read back, and in fact the idea that the set-off clause is a mechanism for enforcing the indemnification provision was also articulated by AES in its opening brief on page 14 where it referred to set-off as an option to enforce Rotundo's broad indemnification obligations. What, can you move, do you have any questions? No, I can. Can you move on to the People Plus point, if you don't mind, before your time runs out? Yes, Your Honor. So as to the priority between the government's tax liens and a query's security interest against Apex Admin, we would submit that there is probative evidence in the record showing that the directional entities, and not Apex Admin or some other company, was in fact the legal owner of the customer. What about this point about People Plus being the owner? I don't think, I'm not sure that a query is taking the position that People Plus is the owner. I think it's taking the position that Apex Admin is the owner, the parent of the directional entity. Right, but I thought they were doing business as People Plus. Doing business as, under an assumed fictitious name, although that doesn't have any effect on legal title. I mean, this was recorded with the Michigan Secretary of State that they were doing business under a particular name. That doesn't affect legal ownership of these customer accounts. No, but what if there's evidence? Their point is solely that there's evidence in the record from which a jury could conclude that People Plus and in turn Apex owned the customer lists. We don't think that there's any evidence of legal ownership by Apex Admin or People Plus. We think that at best this evidence suggests some kind of alter ego, nominee, equitable ownership type of theory, where there's an argument that these separate entities should be collapsed, that the parents and subsidiaries should be collapsed into one another. So why shouldn't that go to a jury? That's not even an issue that a query has raised on appeal. It has not used the word sham transaction, nominee, alter ego, equitable ownership anywhere in its opening or reply briefs, nothing that Mr. Resnick mentioned today. We think that they've waived that argument, that there is no argument on appeal regarding equitable ownership. That's what the evidence they're pointing to might support, but they're not appealing and saying that the district court incorrectly decided that particular issue against them. And even looking at that particular issue, the government still comes out ahead even if you collapse those entities. If you look at this court's decision in Abercrombie and Fitch, what it said is that a party has a judgment, a lien, a security interest against a particular individual or company, and then it's subsequently determined that there's an alter ego or a nominee or something along those lines. When you collapse those two, when you say the collection can proceed against the alter ego entity, that does not displace the tax liens in that case that were filed against the legal ownership of the assets. You're out of time if you want to wrap up unless you have any questions. Sure, but that does not displace the previously recorded notices of federal tax lien which continue to enjoy priority even if there's a subsequent collapsing of those two entities, that the notice of federal tax lien filed against the legal ownership, legal owner, continues to enjoy priority. Okay, thank you, counsel. The case will be submitted. Thank you all very much. Did anyone reserve time? We did. We should have reminded the court. I apologize for that. Oh, okay. That's all right. All right. How much time do you have? You didn't tell us. Two minutes. Okay. You get your two minutes. Scott McDonald, returning to the podium for the AES appellants. I'm going to use my two minutes first to address the Akuri appeal since I didn't get an opportunity to during my initial presentation. Just to set the record straight really quick, the state court found that Akuri had a lien on the assets of Apex Admin, which included its equity in the directional entities. The state court never found that Akuri had a lien on the assets of the directional entities. I thought they conceded that. He said that in his argument. Oh, I thought he said that. Okay, then I'll move on. Thank you. Secondarily, with respect to the raised judicata and collateral estoppel issues, particularly as it relates to Akuri's fraudulent transfer claim, Akuri has taken a position that that was not decided on the merits in the state court. The AES begs to differ. The state court did find as follows, neither the language of the security agreements nor the UCC financing statement gave plaintiff Akuri a security interest in the actual assets, such as customer lists of the directional entities. That's a finding. The court then went on to rule Akuri has no claim against those assets. As a result, well, if Akuri has no claim against the assets in question, it can't have a claim for fraudulent transfer as against the transferee who received those assets. So unless the court has questions, I'll move on. Now, the IRS referenced the Campagna-Torano case, which is distinguished from our case. In that case, it did involve attorney's fees and whether or not they can be collected in interpleader action.  due to some misconduct or misrepresentation made by one of the other parties in the case. Not true here. AES's right is contractual in nature. Nothing needs to be implied. Also quickly, although AES takes the position that the formula used in the consulting agreements to determine the consulting fees and property interest of Rotundo is unambiguous, if the court does find, on its de novo review, that that formula is ambiguous, then under case law, that goes back to the trier of fact. And I'll cite the Wells Fargo case in support of that proposition. Finally, I know my... Your time's up. Okay. Thank you. Thank you very much. Thanks. In rebuttal, Your Honors, I want to clarify as to the Internal Revenue Service's argument that we waive somehow this alter ego theory of equitable ownership. I want to be very clear. Our position isn't that People Plus and Apex Admin are an alter ego of the directional entities. That's not our claim, and that's why we didn't make it, and that's why we didn't waive it. Our claim is Apex Admin owns the assets, period. And we've provided evidence to the district court to establish that, such as the financial records and the banking records and the other things I've mentioned. Secondly, with regard to our complaint, counsel had indicated whether or not the state court had made a ruling with regard to ownership of the customer accounts. Again, we acknowledge that the state court had made a ruling with regard to our security interest, with regard to Apex Admin, People Plus, and the directional entities, not the assets. But the state court did not reach the question of who owned those assets. And the magistrate judge very specifically said in his report and recommendation that that was not reached. So with regard to raised judicata, collateral estoppel, those issues were not ruled on by the merits. They were not raised also in the underlying arguments. And one of the things that we mentioned in our reply brief is you can't raise new legal arguments on appeal. And these raised judicata and collateral estoppel arguments were not arguments that the district court ruled on. There was some dicta related to that, but there was no specific ruling by the district court on collateral estoppel or raised judicata, and they should not be raised now on appeal. Thank you very much. Thank you very much. Thank you, counsel. The case will now be submitted. Thank you all for your arguments.